# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## CINCINNATI DIVISION

| | |
|---|---|
| THOMAS G. TIRONE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 1:19-CV-997 |
| v. ) | |
| ) | |
| AMERICAN LEBANESE SYRIAN ) | JURY DEMAND |
| ASSOCIATED CHARITIES, INC. ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT

Plaintiff Thomas T. Tirone ("Tirone") brings this Complaint against Defendant American Lebanese Syrian Associated Charities, Inc. ("ALSAC" or "Defendant") to remedy unlawful discrimination, harassment, and retaliation. In support, Tirone states as follows:

1. This is an action for equitable relief and damages for unlawful discrimination and retaliation in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-5(f), the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 626, the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12117(a), and the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2617.

## JURISDICTION AND VENUE

2. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331. Tirone's claims arise under the laws of the United States.

3. Venue is proper under 28 U.S.C. § 1391(b).  Defendant is either located, resides, or does business in this District.

4. Tirone filed a Charge of Discrimination, No. 490-2018-00872, with the Memphis District Office of the U.S. Equal Employment Opportunity Commission ("EEOC") on December 26, 2017.

5. Charge No. 490-2018-00872 alleges that ALSAC discriminated against him based on his race, age, and disability and retaliated against Tirone for complaining about unlawful discrimination.

6. EEOC issued Tirone a Notice of Suit Rights on Charge No. 490-2018-00872 on August 28, 2019, attached hereto as Exhibit 1.

7. Tirone has fulfilled all jurisdiction prerequisites to filing this suit.

## PARTIES

8. Tirone is a resident of Middletown, Ohio.

9. ALSAC employed Tirone from 2013 until his unlawful termination on May 23, 2017.

10. ALSAC is an Illinois corporation whose principal office is located at 501 Saint Jude Place, Memphis, Tennessee 38105-1905.  Its registered agent for service of process is CT Corporation System, 300 Montvue Road, Knoxville, Tennessee 37919-5546.

11. Plaintiff is white, disabled, and was 63 years old at the time of his termination in 2017.

12. ALSAC subjected Tirone to discrimination and harassment because of his race.

13. Defendant also subjected Plaintiff to unlawful retaliation after he engaged in protected activity, including retaining counsel, asserting discrimination and harassment claims, and threatening legal action to combat discrimination.

## FACTS

14. Tirone is a highly qualified, well-educated individual with a unique skill set and a long, successful track record.

15. ASLAC recognized his qualifications and hired Tirone on April 15, 2013, as the Senior Director of the Center of Excellence in Analytics ("COEA") at ALSAC.

16. The COEA was new to ALSAC, and Tirone was tasked with building the COEA from scratch.

17. He was given the specific mandate to "change the culture at ALSAC" to "compete on analytics."

18. On July 8, 2013, Tirone hired Glenn Sigler ("Sigler") as an Individual Contributor ("IC").

19. Sigler is an African American, younger than Tirone, appears to be much younger than Tirone, and is neither disabled nor perceived as having a disability.

20. COEA grew very successfully from internal demand for its services, as COEA hiring was determined by the department(s) that needed COEA's help.

21. Tirone's performance was excellent, as recognized in his first performance review on October 27, 2014, where Tirone received an overall rating of 110 out of 120, or a "Far Exceeds Expectations."

22. ALSAC again recognized Tirone's excellence in January 2015 when George Shadroui, Tirone's immediate supervisor, informed Tirone that he would be promoted to Executive Director of COEA, a one-level promotion.

23. ALSAC's CEO, Rick Shadyac ("Shadyac"), stated that Tirone's promotion was a "no brainer."

24. Shadroui also promoted Sigler to Senior Director of Administration and Planning, a new section of COEA, where Sigler would continue to report to Tirone.

25. Shadroui's promotion of Sigler skipped the standard management progression of Manager, Senior Manager, Associate Director, Director, proceeding directly to Senior Director—a four-level promotion.

26. Tirone protested that Sigler was not qualified for a Senior Director role, as Sigler lacked recent or commercial management experience and training.

27. Shadroui overruled Tirone's objections.

28. In a one-on-one meeting on May 14, 2015, Shadroui directed Tirone to give Sigler the highest rating in each category of a new performance-versus-potential matrix.

29. Tirone protested that Sigler did not earn top marks in all categories, was not expert enough to do his job, and had only been in his Senior Director position for three months.

30. Shadroui insisted on top marks for Sigler.

31. Tirone complied with Shadroui's instructions.

32. Shadroui also demanded that Tirone increase Sigler's marks on at least one performance review.

33. Tirone had completed Sigler's performance review and had submitted it to Shadroui, who demanded that Tirone increase Sigler's marks.

34. Tirone complied with Shadroui's demand to increase Sigler's marks.

35. On May 21, 2017, Shadroui additionally suggested that Tirone accept a demotion and move to an individual contributor ("IC") role so that Sigler could take Tirone's Executive Director position.

36. Tirone refused to accept a demotion and continued to serve as Executive Director of COEA.

37. On October 19, 2015, Tirone received his annual performance appraisal for the prior fiscal year, which ended June 30, 2015.

38. His overall rating was 100 out of 120, or "Exceeds Expectations."

39. Throughout 2016, Tirone excelled, meeting, exceeding, or far exceeding expectations.

40. At a staff meeting on August 26, 2016, Shadroui and Betty MacDougall, ALSAC's Vice President of Executive Communication, announced that they were starting a CEO-mandated initiative for "diversity and inclusion."

41. On October 5, 2016, Tirone received his performance review for the prior fiscal year.

42. His overall performance rating was 95 out of 120, or "Exceeds Expectations."

43. Tirone continued his excellent performance in 2017, achieving all his objectives for his performance review over two months early, including filling four vacant positions while COEA was under a heavy workload, with minimal overtime.

44. In the Quarterly Operating Review meeting held on April 12, 2017, Shadyac made the following statement: "I'm serious about this multicultural and diversity issue people. Just look in this room; we have 65 people here and what, 8 multicultural? We're not doing an adequate job, people, we have to do more."

45. There were 8 African Americans in the April 12, 2017 meeting.

46. Shadyac did not include in his tally of "multicultural" employees two Hispanics, three South-Asian Americans, and one Asian-Indian also present at the April 12 meeting.

47. Shadyac only considered African Americans as meeting ALSAC's multicultural or diversity initiatives.

48. The next day, Shadroui spent two hours in an afternoon meeting with Tirone trying to convince Tirone to accept a demotion to become an IC so that Sigler could take the Executive Director of COEA position.

49. It was unclear to Tirone what exactly this demotion to an IC job would entail or to whom Tirone would report.

50. Although Tirone was concerned he would be fired if he did not agree to take the IC role, he was never provided a deadline by which he needed to inform Shadroui whether he would agree.

51. Tirone also was never provided any clearly defined description of the IC role.

6

52. Approximately three hours later on April 13, 2017, ALSAC's Chief Financial Officer, Jeff Pearson ("Pearson"), called Tirone and said that Pearson heard from Shadroui about Tirone's and Shadroui's discussion.

53. Pearson stated he had offered to Shadroui to have Tirone transfer to finance under Pearson to head the new Financial Planning and Analysis ("FP&A") group.

54. The initial plan was to take the COEA's P&A group, which was headed by Sigler, and create a new FP&A reporting to Pearson in the finance department.

55. Pearson told Tirone that Pearson offered to essentially swap Sigler for Tirone, making Sigler the head of COEA and making Tirone the head of FP&A.

56. Pearson told Tirone that Shadroui jumped at this proposal, and Pearson expressed it would be better for him because Tirone was far more capable than Sigler.

57. It was not clear that Tirone would be an IC or an Executive Director in Pearson's proposed role.

58. Tirone was not given a deadline to decide whether he would want to move to FP&A or to become an IC under Shadroui or Pearson.

59. During 2017, ALSAC's leaders admitted to significant pressure to have more African American managers.

60. Those leaders removed, demoted, fired, or asked to leave various managers, replacing the former managers with African Americans.

61. ALSAC's leaders admitted that Tirone was being asked to volunteer for a demotion to make room for an African American Executive Director, Sigler.

7

62. On May 4, 2017 in one-on-one meeting with Tirone, Shadroui admitted that the word "diversity" is ALSAC code for African American.

63. Shadroui also told Tirone that ALSAC has been under a lot of pressure from the City of Memphis to make the demographics of ALSAC's leadership and management match the demographics of Memphis (over 60% African American).

64. This pressure stemmed from ALSAC's planned "Pinch District Redevelopment Project," to which the City of Memphis must approve before governmental entities, including the City of Memphis, will contribute millions of dollars to the project.

65. Prior to his termination, Tirone spoke to Pearson about Shadroui's offer of a demotion or potential termination for Tirone.

66. Pearson admitted to Tirone that the proposed demotion was a way to get Sigler, an African American, into an Executive Director role and therefore improve ALSAC's "diversity."

67. Pearson also indicated that Shadroui was retaliating against Tirone for refusing to step down to let Sigler take Tirone's position two years earlier.

68. On Wednesday, May 10, 2017, Tirone wrote to ALSAC's Chief People Officer, Senior Vice President of HR Diane Heyman ("Heyman"), that he believed the request that he "volunteer" to be an IC was the result of unlawful discrimination and that he declined to become an IC and requested that the company investigate the true motives for the proposed demotion.

69. Tirone copied Shadyac and Shadroui on this correspondence.

70. On Saturday, May 13, 2017, Heyman called Tirone to set a meeting for the following on Monday with ALSAC's Chief Legal Officer, Sara Hall ("Hall"), and Heyman to investigate his complaint.

71. During the May 15 telephone meeting with Tirone, Hall, Heyman and Douglas Janney (Tirone's attorney), Hall admitted that Tirone was good at his job and offered no reason for Tirone's demotion or the ALSAC behavior that prompted Tirone's complaint.

72. On May 17, 2017 the following events transpired:

a. At 9:19 a.m., Heyman emailed Tirone, informing him that ALSAC has concluded its investigation and determined that there is no "basis for his allegations of discrimination and harassment."

b. At approximately 10:00 a.m., Tirone's chronic herniated disc in his back was twisted by an x-ray tech, causing considerable pain.

c. Tirone took his medication, waited until the pain subsided, and continued to work.

d. At 1:30 p.m., Hoeschen and Tanya Holmes ("Holmes"), Director of ALSAC Legal Department, arranged a meeting with Tirone with no reason provided.

e. Tirone reported to the meeting as requested, and the two quizzed Tirone about emails he sent home with ALSAC information.

f. Holmes presented Tirone with a document to sign, where Tirone was to list all the documents he had ever sent home.

9

g. Tirone was heavily medicated, in pain, and shaken by becoming the subject of an email investigation just hours after ALSAC closed the investigation into his complaints of illegal discrimination, and a week after he complained of unlawful discrimination.

h. Holmes and Hoeschen asked for Tirone to list every document he emailed to his personal email from ALSAC by 10:00 a.m. the next morning.

i. Tirone explained that he was in severe pain and that it was not fair for Hoeschen and Holmes to assume that when Tirone got home, he could sit down and perform that task.

j. Tirone requested two days to provide the list of emails.

k. Holmes and Hoeschen insisted that, because they were asked to conclude this investigation by the next day and Tirone could complete the list by looking at his "sent" folder on his ALSAC computer, he could provide the list by 10:00 a.m.

l. Tirone asked if others are being investigated and Holmes and Hoeschen admitted that only Tirone was being investigated.

73. Tirone believed he was being singled out for an email audit as retaliation for his complaints of unlawful discrimination and harassment.

74. Tirone emailed Holmes and Hoeschen that the action "smack[ed] of illegal retaliation against me for my complaint about illegal activity at ALSAC."

75. Tirone exercised pre-approved FMLA leave for his injured back from May 18 through May 21, 2017.

10

76. He was bedridden, on prescription medication, and in severe pain.

77. Tirone returned to work on Monday, May 22, 2017.

78. Upon arriving at work on Monday, May 22, Pearson instructed Tirone to develop a presentation for Pearson on an expedited basis.

79. Tirone immediately began working on this presentation and continued working on the presentation until his employment with ALSAC was terminated.

80. On May 23, 2017, at 3:00 p.m., ALSAC notified Tirone his employment was terminated.

81. The reasons given at the time of termination were that Tirone refused a four-level demotion and had not provided a list of emails as requested at 1:30 p.m. on May 17, 2017.

82. ALSAC terminated Tirone less than two weeks after he leveled accusations of discrimination and harassment against ALSAC.

83. Considering Tirone took intermittent FMLA leave from May 18 through May 21, ALSAC fired him on the 7th non-FMLA workday after he complained, and on the 2nd non-FMLA workday after ALSAC closed its investigation into Tirone's complaint.

84. ALSAC provided Tirone no rational explanation as to why he, and he alone, was subjected to an email audit.

85. ALSAC provided no explanation why it needed Tirone to log all files he emailed to his home, even though ALSAC has access to Tirone's email history for at least two years.

86. ALSAC was not satisfied with a retaliatory discharge of Tirone.

87. Tirone, through his attorney, contacted ALSAC about his unlawful termination.

88. ALSAC and Tirone, through their attorneys, entered into settlement negations to try to resolve Tirone's discrimination claims.

89. Tirone, through his attorney, expressed that it would be difficult, if not impossible, for someone his age to obtain a comparable position and provided an analysis of his projected lost income through a trial as well as front pay after the trial.

90. During the negotiations, ALSAC expressed concerns that Tirone may make public statements that were harmful to ALSAC's reputation.

91. Exhibit 2 recounts the discussion between Hall and Tirone's attorney in which ALSAC expressed concerns that Tirone may perform an analysis on publicly available information in order to harm ALSAC's reputation.

92. ASLAC invited Tirone and his attorney to an in person settlement meeting with Hall and Shadyac, which could include a professional mediator to try to resolve Tirone's discrimination claims.

93. On November 6, Tirone's attorney communicated to ALSAC that Tirone refused a face to face meeting but that he was still interested in resolving his claims.

94. On November 7, Hall informed Tirone's attorney stating "[g]iven how far apart we are on settlement we do not believe that it would be productive to make a counter offer at this time. We remain available if you and your clients are willing to meet and discuss."

95. On November 8, Hall sent Tirone's attorney a text message stating, "I sent you an email yesterday afternoon and wanted to make sure you saw it."

96. Tirone's attorney responded that he had gotten the text, which was intended to indicate that Tirone was still not interested in a meeting.

97. At 6:00 a.m. on November 9, 2017, the FBI raided Tirone's home based upon knowingly false information that ALSAC had provided the FBI.

98. The FBI raided Tirone's home with a SWAT team and pointed loaded firearms at Tirone and his wife while they were outside and undressed, and confiscated Tirone's computers, phones and other personal property.

99. Tirone learned later that the FBI raided his house because, on November 1, 2017, ALSAC falsely alleged to the FBI that Tirone set up a fake website to divert donor money from ALSAC to Tirone.

100. ALSAC had no credible evidence that Tirone set up a website designed to and Tirone did not set up any such website.

101. ALSAC also misrepresented to the FBI the significance of Tirone emailing documents to himself to work from home, as this practice was commonplace at ALSAC.

102. Even Tirone's boss, Shadroui, had e-mailed ALSAC proprietary documents to Tirone's personal email so that Tirone, out from work due to illness, could explain them by telephone to Shadroui.

103. ALSAC had no real concern about Tirone using its confidential or proprietary data.

104. Rather, ALSAC used the FBI to intimidate, to silence, and to discredit Tirone in retaliation for his threats of pursuing civil litigation.

105. Defendant did not want to risk Tirone moving forward with his claims in which he alleged that ALSAC intended to replace him with a much less qualified African American so that ALSAC could appease the City of Memphis and obtain its approval and funding for the Pinch District Redevelopment Project.

106. This information becoming public would risk alienating a large part of ALSAC's donor base, which is actually the donor base for St. Jude's Children's Research Hospital.

107. In addition, ALSAC did not want Tirone to discredit ALSAC in his civil suit by using his analysis on publicly available data to demonstrate that ALSAC has a long history of misrepresenting matters to the donating public.

## COUNT I
### Race Discrimination and Retaliation
### 42 U.S.C. § 1981

108. Tirone incorporates by reference all preceding allegations.

109. ALSAC terminated Tirone's employment.

110. Tirone had an oral contract of employment with ALSAC and executed other contracts related to his employment with ALSAC.

111. Tirone's race was a motivating factor in the decision by Defendant to terminate Tirone's employment.

112. Tirone engaged in protected activity by, among other things, retaining counsel to represent him for claims of race discrimination; complaining about race

discrimination, harassment, and retaliation; and asserting that he would file an EEOC charge for race discrimination and a § 1981 claim for race discrimination.

113. Defendant knew about Tirone's protected activity.

114. Tirone's protected activity was a motivating factor in Defendant's decision to terminate Tirone.

115. Defendant acted with malice and reckless indifference toward Tirone's federally protected rights.

116. As a direct and proximate result of Defendant's discrimination and retaliation, Tirone has suffered, and continues to suffer, emotional pain and suffering, professional and personal embarrassment, humiliation, loss of enjoyment of life, and inconvenience, as well as incidental and consequential damages.

117. As a direct and proximate result of Defendant's discrimination and retaliation, Tirone has suffered, and continues to suffer, lost earnings and a diminished ability to earn a living.

### COUNT II
### Race Discrimination and Retaliation
### 42 U.S.C. § 2000e-5(f)

118. Tirone incorporates by reference all preceding allegations.

119. Defendant terminated Tirone's employment because of his race.

120. Tirone's race was a motivating factor that prompted Defendant's decision to terminate Tirone.

121. Tirone engaged in activity protected by Title VII by, among other things, retaining counsel to represent him for claims of race discrimination; complaining about

race discrimination, harassment, and retaliation; and asserting that he would file an EEOC charge for race discrimination.

122. Defendant knew about Tirone's Title VII–protected activity.

123. Defendant terminated Tirone's employment.

124. Defendant terminated Tirone because of his protected activity.

125. Defendant acted with malice and reckless indifference toward Tirone's federally protected rights.

126. As a direct and proximate result of Defendant's discrimination and retaliation, Tirone has suffered, and continues to suffer, emotional pain and suffering, professional and personal embarrassment, humiliation, loss of enjoyment of life, and inconvenience, as well as incidental and consequential damages.

127. As a direct and proximate result of Defendant's discrimination and retaliation, Tirone has suffered, and continues to suffer, lost earnings and a diminished ability to earn a living.

## COUNT III
## ADA Retaliation
## 42 U.S.C. § 12117(a)

128. Tirone incorporates by reference all preceding allegations.

129. While employed with ALSAC, Tirone was disabled within the meaning of the ADA.

130. Tirone engaged in activity protected by the ADA by, among other things, retaining counsel to represent him for claims of disability discrimination; complaining

about disability discrimination, harassment, and retaliation; and asserting that he would file an EEOC charge for disability discrimination.

131. Defendant knew about Tirone's ADA–protected activity.

132. Defendant terminated Tirone's employment.

133. Defendant terminated Tirone's employment because of his protected activity.

134. Defendant acted with malice and reckless indifference toward Tirone's federally protected rights.

135. As a direct and proximate result of Defendant's retaliation, Tirone has suffered, and continues to suffer, emotional pain and suffering, professional and personal embarrassment, humiliation, loss of enjoyment of life, and inconvenience, as well as incidental and consequential damages.

136. As a direct and proximate result of Defendant's retaliation, Tirone has suffered, and continues to suffer, lost earnings and a diminished ability to earn a living.

## COUNT IV
### ADEA Retaliation
### 29 U.S.C. § 626(c)

137. Tirone incorporates by reference all preceding allegations.

138. Tirone was Defendant's employee.

139. Tirone was at least 40 years old at the time of his termination.

140. Tirone engaged in activity protected by the ADEA by, among other things, retaining counsel to represent him for claims of age discrimination; complaining about age discrimination, harassment, and retaliation; and asserting that he would file an EEOC charge for age discrimination.

141. Defendant knew about Tirone's ADEA–protected activity.

142. Defendant terminated Tirone's employment.

143. Defendant terminated Tirone's employment because of his protected activity.

144. Defendant's actions were willful.

145. As a direct and proximate result of Defendant's retaliation, Tirone has suffered, and continues to suffer, emotional pain and suffering, professional and personal embarrassment, humiliation, loss of enjoyment of life, and inconvenience, as well as incidental and consequential damages.

146. As a direct and proximate result of Defendant's retaliation, Tirone has suffered, and continues to suffer, lost earnings and a diminished ability to earn a living.

147. Tirone is entitled to liquidated damages.

### COUNT V
### FMLA Retaliation
### 29 U.S.C. § 2617

148. Tirone incorporates by reference all preceding allegations.

149. Tirone was employed by Defendant.

150. Tirone was eligible for FMLA leave.

151. Tirone was entitled to FMLA.

152. Tirone took FMLA leave in May 2017.

153. Defendant instructed Tirone to compile a list of emails sent to his personal email account during his FMLA leave.

154. When Tirone did not complete the work that Defendant instructed him to during his period of FMLA leave, Defendant terminated his employment.

155. Defendant's termination was an adverse employment action.

156. Defendant took that adverse employment action because Tirone did not complete the work that Defendant instructed him to while he was on FMLA leave.

157. Defendant's actions were willful.

158. As a direct and proximate result of Defendant's retaliation, Tirone has suffered, and continues to suffer, emotional pain and suffering, professional and personal embarrassment, humiliation, loss of enjoyment of life, and inconvenience, as well as incidental and consequential damages.

159. As a direct and proximate result of Defendant's retaliation, Tirone has suffered, and continues to suffer, lost earnings and a diminished ability to earn a living.

160. Tirone is entitled to liquidated damages.

**PRAYER FOR RELIEF**

Plaintiff respectfully prays that this Court grant the following relief:

A. A jury trial on all triable issues;

B. Judgment in favor of Plaintiff and against Defendant on all Counts in this action;

C. Injunctive relief prohibiting future discrimination and retaliation;

D. Back pay and benefits to Plaintiff;

E. Reinstatement and/or front pay and benefits to Plaintiff;

F. Compensation to make Plaintiff whole for the loss of benefits;

G. Compensatory damages for embarrassment, humiliation, emotional pain and suffering, mental anguish, severe stress and anxiety, psychological harm, inconvenience, and loss of enjoyment of life;

H. Punitive damages to Plaintiff;

I. Attorneys' fees and expenses to Plaintiff;

J. Prejudgment interest and, if applicable, post-judgment interest; and

K. Such other and further legal or equitable relief to which Plaintiff may be entitled.

Dated: November 21, 2019          Respectfully submitted,

/s/ *Charles P. Yezbak, III*
Charles P. Yezbak, III (TN BPR #018965)*
N. Chase Teeples (TN BPR #032400)*
**YEZBAK LAW OFFICES PLLC**
2002 Richard Jones Road, Suite B-200
Nashville, TN 37215
Tel.: (615) 250-2000
Fax: (615) 250-2020
yezbak@yezbaklaw.com
teeples@yezbaklaw.com
*pro hac vice anticipated*
*Attorneys for Plaintiff*

-and-

/s/ *Jessica R. Doogan*
Jessica R. Doogan (OH BAR #0092105)
**BARKAN MEIZLISH DEROSE WENTZ McINERNEY PEIFER, LLP**
250 E. Broad Street, 10th Floor
Columbus, OH 43215
Tel.: (614) 221-4221
Fax: (614) 744-2300
jdoogan@barkanmeizlish.com
*Local Counsel for Plaintiff*

20